ucation, 19-2738, and we'll turn first to Attorney Jordan Harlow. Good afternoon. Good afternoon, your honors. May it please the court. My name is Jordan Harlow on behalf of the appellant, Jason Agosto. Although there are a number of issues in this matter, the main issue that I would like to address is that of qualified immunity and if time allows, no mal-liability. As to the issue of qualified immunity, I'd like to begin by highlighting two major distinctions between this matter and Montero and specifically why qualified immunity should not have been granted here as it was in Montero. The first distinction is that the protected speech Montero engaged in was far more limited in scope when compared to Mr. Agosto's. Montero's speech concerned speaking at a union meeting, whereas Mr. Agosto's speech took various forms. Grievances and document requests on behalf of the entire union chapter, representation of union members and meetings with the administration, as well as, like in Montero, outspoken comments at public meetings. This distinction is critical because although as Montero held the role of a citizen analog in determining whether one speaks as a citizen remain murky, this was for speech outside the context of a union grievance. Within the context of a union grievance, Weintraub made it clear that the lack of a civilian analog was not despondent. Judge Hellerstein thus erred in treating all of Mr. Agosto's union activity as the same type of speech. The second major distinction is that the relevant acts in Montero took place from 2012 until 2014. In contrast, the relevant acts in this matter took place in May of 2016 and continuing until June of 2019. This is critical because a number of district and out-of-circuit cases were decided subsequent to the acts in Montero that clearly established that all of the union activity and speech, such as that by Jason Agosto, were as a private citizen and constituted protected speech under the First Amendment. In Pakowski, the Southern District expanded upon CLU, which was decided in 1999, and unequivocally held that when an individual speaks as a representative of the teachers' union, he acts as a private citizen. The court in Pakowski further held that union representation of teachers was a feature of contemporary public debate and thus a matter of public concern. We submit that Pakowski clearly established that no civilian analog was necessary to establish that when a person speaks in his or her capacity as a union representative, he or she speaks as a private citizen. As Montero recognized, other out-of-circuit courts have also conclusively held prior to the speech that occurred in this matter, that when a person speaks in his or her capacity as a union representative, he or she speaks as a private citizen. Taken together, Pakowski, CLU, and these out-of-circuit cases on which Pakowski relies clearly established that when an individual speaks as a union representative and represents teachers in the manner that Pakowski and, by extension, Agosto spoke, they are speaking as a private citizen. I would also like to touch on Lynch, as appellees rely on Lynch for their position that it was far from clear that a union member's grievance protesting violations of union rights was not a matter of public concern, even though this was not a ground on which the district court granted qualified immunity. It's our position that Mr. Agosto's grievances were far more in line with district court cases that clearly held that such grievances were related to a matter of public concern, such as in Pakowski and Paisley, or that union membership is per se a matter of public concern, which is not found in Buckley, Zena, and Donovan. Further, the appellee's position is simply not what Lynch held. We believe that the Lynch court holding was quite limited to labor versus management disputes that had a strong flavor of personal grievance. In contrast, there was nothing personal about Mr. Agosto's grievances. He was filing them as a union representative on behalf of the chapter, and they were clearly related to the rights of the union as a whole, rather than his own personal rights. Additionally, Lynch foreshadowed that such grievances could be on a matter of public concern. The court held in Lynch that it is rarely difficult for a plaintiff to construct an argument that the dispute is a matter of public concern, either because it relates to the delivery of services to the public, or because it invokes basic aspects of the right to unionization. Some such arguments might well be persuasive, others not. I believe that Lynch clearly foreshadowed that these types of grievances pertain to a matter of public concern, and in conjunction with these other district court cases I've referenced, it was clearly established that the types of grievances and speech that Mr. Agosto engaged in were on a matter of public concern. As to how to determine if this law is clearly established or not, I'm not aware of any strict test on what constitutes sufficient law or sufficient precedent to meet the clearly established threshold. However, I would like to reference a quotation from the Matusik matter, which was decided in 2014. In that decision, the court stated that the law must nonetheless be well enough settled, capable of making a reasonable person aware of whether an act violates the constitutional right, so that in fairness and pursuant to the purpose of qualified immunity to protect public officials acting in good faith, the defendant can be held to account for violation. This is on page 61 of the decision. I think ultimately this comes down to what standard we want to hold public officials such as principal, such as Principal Urania. This court has recognized that higher ranking officials, as is the case here, essentially a principal is a CEO of the school. This court has recognized that higher ranking officials are held to a higher standard of legal knowledge than are their subordinates. We submit that the law is well enough settled that a reasonable person in Principal Urania's position should have been aware that his action violated a constitutional right. To hold otherwise would set an exceptionally low bar for officials such as principal. I'd also just like to briefly touch on the issue of Monell liability. Regarding Monell liability, the district court erred in holding that Principal Urania's acts of issuing unwarranted, what we submit are unwarranted letters to file and individual observation reports were reviewable and thus not the acts of a final decision maker. Excuse me, you have a minute left. Okay. The reality is that these letters and observation reports cannot be reviewed. This is distinguishable from overall rating and formal discipline to Education Law 3028. In addition, I believe it's a red herring whether or not as to whether Principal Urania was implementing or frustrating a policy. There was no clear state or city policy outlining how and why a principal can issue individual letters to file and observation reports. So there was no policy to implement or frustrate. The harm that befell Mr. Augusta by these letters and observation reports was entirely under the principal's control and not subject to review by another official or entity. And finally, I would also just note that the district court has held that the act of charging a teacher with 3028 charges is the act of a final policymaker in the matter of fatality. I believe I'm out of time. So thank you. Thank you, Mr. Harlow. Judge Laurier, any questions? Just one question. Mr. Harlow, do I understand your argument with respect to whether on the public speech aspect of this case, whether that's clearly established that you're saying it is clearly established by reference to district court decisions and out-of-circuit decisions? Yes, Your Honor. I believe, as I noted in Matusik, this court has recognized that the law can be clearly established by out-of-circuit and district court decisions. And I think the conjunction of these district court decisions as well as the out-of-court decisions, which just for reference, the Sixth Circuit in 2015 held that this type of speech is protected in Bolton v. Swanson. The Ninth Circuit has held this in Ellens v. City of Sierra. And the Seventh Circuit also has held this in Nagel v. Village of Calumet Park. In addition, there's been a number of district court cases in Eastern District and Southern District that have all established that this type of speech is protected. And I think it would be, for a principal or an official such as Mr. Urien to state that it wasn't clearly established, I think it would be bad faith. And to hold otherwise, I believe, would essentially set this bar extremely low for the law, for the contingent principles. So I think you said a moment ago that there was no clear city policy about when or how to follow observation reports or letters. But to get Monell liability, you have to be challenging a policy of the municipality, right? So what is the policy of the New York City Department of Education that you're challenging? Well, the policy has been made essentially by the decision maker, by the official. There's no... You know, to form Monell liability, I believe the third way in which you can hold the city liable is if an act of an official constitutes policymaking. And a principal can create policy within the school. It's a limited policy, but it's still policy nonetheless. And there have been decisions... I mean, so there might be a question about whether a policy of the school is a policy of the Department of Education. But regarding putting that aside, but what's the policy even for the school that IRENA is establishing here? Just the policy that I'm going to file these particular letters about this particular employee. Well, the policy is that essentially a principal has ultimate discretion in issuing letters to file and issuing individual observation reports and thus engaging in what's considered retaliatory... But are you challenging the policy that a principal can file letters and observation reports? No, we're not challenging that policy per se. We're challenging the manner... Because these particular letters you think are retaliatory, right? Correct. The manner in which a principal is going to engage in this activity... Sorry, engage in... Your argument is just that because nobody above the principal was going to change the letters, the particular letters about the particular employee were the policy of the New York City Department of Education. Well, my argument is that the substance of these letters and individual observation reports cannot be reviewed. There is no review... There is no procedure in order to review them. The only mechanism are grievances, and those can only challenge procedural violations. So for the... I understand. I'm not asking whether it can be reviewed. I'm asking whether it's a policy. Like, can you have a policy that is a one-off thing that applies to one particular person? Well, I don't think it was a one-off thing. I mean, there's... In the record, it's established that Mr. Urania didn't only engage in this behavior towards Mr. Agosto, he engaged in this behavior towards other teachers. He used it as a weapon to retaliate against teachers in the school to clamp down on student activity. Yeah, but is your allegation... Are you challenging a purported policy to use letters as a weapon against teachers?  Well, I believe that this policy was created by... Through... This policy was created in a limited scope by Mr. Urania's action. I don't believe there needs to be an overall department-wide policy. It can still be a policy as pertains to this particular school, and that's why... It has to be a policy of the municipality, right? I mean, to get liability for municipality. Correct. I agree with you, Your Honor, but I believe that this can still be considered a policy of the municipality as it pertains to this particular school. So, the idea is that the New York City Department of Education has a policy at this particular school of using observation reports and letters as a weapon against recalcitrant teachers? Yes, that is my position. And this has been... This policy has been created through Mr. Urania's actions and through the department's failure to take any corrective action, and further by the fact that... Now, are there any consequences from issuing the letter to file? Like, does it do anything? Well... Yes and no. There's potential consequences, which any tenured teacher would know. These letters to file could ultimately lead to the issuance of 3028 disciplinary charges, which is actually what happened here, but it didn't happen until years later because it takes... Yeah, but so if the letters lead to the filing of 3028 disciplinary charges, there are higher levels of review for 3028 disciplinary charges, right? There's no... I'm not aware of any process to... Once a teacher's been charged, to challenge that actual... Just being charged. Once a decision is rendered by an arbitrator, there is an Article 75 review, although that is an extremely narrow scope of review. But regarding the actual filing of the charges, when a teacher's... While those charges are pending, a teacher may be removed from the school. There are certain... The teacher could be ineligible for... The charges can be found not to be meritorious, right? Eventually, yes, but during the pendency of these charges, the teacher is in limbo and there's no way to... And is actually experiencing... For example, in Fortellus, the teacher was... During the pendency of charges, was suspended, was ineligible for certain things like first section overtime pay. And eventually, he was not terminated to the charges, but during that entire pendant... But he had to wait years for those charges to be decided. During the pendency, there was no mechanism to review whether or not he should have been charged in the first place. But just going back to Your Honor's original question as to the significance of these underlying letters to file and individual observation reports, under First Amendment law, these acts have been held to constitute retaliatory acts because they have a chilling effect on the employee's behavior. So, I believe, essentially, this can be considered... These acts rise to the level of policy because they're done in a manner to chill behavior. The policy is that these acts are used as a weapon in order to chill protected speech, which is what occurred here. Okay. Okay. So, then it's a general policy of using them to chill protected speech. It's not specific to the death. It does so. Well, it's been... I believe it's... Correct. It's been used with other teachers. I believe it was established through this conduct. And the fact that this has been... That this conduct is... Okay. Can I ask you another thing? So, on the matter of public concern question, so it's true that we've said that when you're acting in a union capacity, because it's not part of your duties as an employee, you're speaking as a private citizen, but we've also said that when union speech or union grievances seems to be focused on labor disputes that concern the person's employment, it's not a matter of public concern, right? Yes, that is true, Your Honor. In certain contexts, the grievances are essentially personal in nature. I think the relevant question is... So, like in this case, when Augusto is filing a grievance about the C6 menu for teachers to use during their professional period, I mean, that's about the internal governance of the school and his own employment conditions, right? Your Honor, I respectfully disagree. In fact, regarding the C6 mechanism, this is essentially a mechanism in order to modify the schedules of teachers. The chapter as a whole, which included, I don't know, I believe dozens if not hundreds of teachers, wanted to ratify that. They actually agreed with Principal Urania's proposal, but he circumvented the process in the collective bargaining agreement, which basically requires that he propose a modification to the chapter leader to say, approve it, and then they put it to a vote for the chapter. Principal Urania said, I don't care what the collective bargaining agreement says. I'm going to do it unilaterally. I'm going to circumvent the entire process. I'm going to circumvent what the collective bargaining agreement states. Mr. Augusto filed numerous grievances, and ultimately, this went to arbitration, and the arbitrator agreed with Mr. Augusto that this violated the collective bargaining agreement. First, one, Mr. Augusto had nothing personal to gain because he wanted to ratify this in the first place. This was fundamentally about the rights of the union and about the fact that Principal Urania, as a representative, as an official of the Department of Education, was ignoring the collective bargaining agreement. This was fundamentally about protecting the rights of the union. We said in Montero that a public employee can't transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run. It can't just be that you say, well, it's important, and so the public must be interested in it. But you're saying that Augusto didn't even have a personal interest in the C6 options? He had no more personal interest in any other teacher in this chapter, or any other union member, for that matter. He had no more interest in any other teacher, but it did affect his working conditions, right? Well, not actually. I don't think it did because, again, whether this proposal by Mr. Urania was unilaterally implemented by him or implemented through the ratification by the C6 procedure, this modification was going to happen. They agreed with the modification, so it actually was going to have no effect on him because either way, the modification was going to happen. What the grievance was fundamentally concerned with was just bypassing this procedure as outlined in the collective bargaining agreement, which could have theoretical future impact because if a principal is, in this context, allowed to bypass this type of procedure, then it sets a precedent for future principals in other schools, anywhere in the DOE, to Right. So what you're saying is it's a matter of public concern because the public should be concerned about how our public schools are run. Well, it's a matter of public concern because it invokes the basic aspects of unionization, and that's fundamentally a... Well, in most cases about unionization, that's about whether somebody is retaliating because you're a member of the union, simply, right?  Well, I believe those cases were actually more about advocacy for the union. As the court in Lynch foreshadowed, when matters touch on the basic aspects of unionization, they fundamentally are a matter of public concern, and I think here, this could not be more about the basic aspects of unionization because it is literally about... One more question, which is the budget documents. So we've said before in a case called Singer versus Farrow, that payroll discrepancies and budgetary irregularities, we don't think that that's something that the public would be interested in. Is there something bigger that Augusto was getting at when he requested the budget documents? What was the purpose of that request? The purpose of that request is essentially just to know where the money went. So I believe the department argued that, well, this fundamentally had to do with his own personal paycheck, for example. But obviously, when you look at the school's budget, it doesn't just go towards the payroll. It goes towards a number of other things. And so schools are funded by the public, and the principals control this budget. But in this case, he didn't have any allegation that there was some kind of widespread corruption going on. He just wanted to get some insight into how the budget was being administered, where all the money was going. Your Honor, I believe he had some suspicion that there might have been some malfeasance. But you're correct. It was mainly just to receive the information, because this information is not public. The union wanted to know where the money was. It wasn't just Mr. Augusto. He was making his request on behalf of the union. All right. Thanks very much. Thank you, Your Honor. Thank you, Mr. Harlow. You deserve two minutes. We'll turn now to Mr. DiSilvio. Let me ask a clerical question first. Mr. DiSilvio, we have your name written in different ways, in different documents. Your surname is Silvio, or is it DiSilvio? DiSilvio. There's a space in between two separate words. Okay, great. Thanks. I'm glad to have that. And it's Lorenzo, as in Lorenzo the Magnificent. I try to be magnificent, but we'll see if I do that today. All right. Mr. Harlow, I have a clerical question for you. I'm sorry. It's one of my major duties to get these things straight. You're with the law firm of Glass and Hagrogian? Yes, Your Honor. Actually, the law firm is now Glass, Harlow, and Hagrogian. I apologize that we did not submit a thing. No, no, no. That's fine. But you're part of the firm. Correct. Okay, that's fine. Correct. So it's Glass, Harlow, and Hagrogian. Good. That is correct, Your Honor. Congratulations. I hope. Thank you. Okay. This is DiSilvio. Thank you, Your Honor. On behalf of the appellees, may it please the court. I'm happy to answer any questions that the panel has about the Title VII claims. But like Mr. Harlow, I'll limit my comments to the First Amendment retaliation claims and make three basic points. The first is that there was no violation of Mr. Augusto's First Amendment rights, because neither the grievances he filed on behalf of the UFT chapter at the High School of Art and Design, nor his representation of other teachers, address any matter of public concern. Rather, the grievances and the representation of other teachers all involved workplace issues internal to a single high school in the New York City school system, not bigger picture issues of general interest or legitimate news interest to the community. And just because Mr. Augusto was representing teachers other than himself, certainly the grievance was not personal to him, does not mean that the grievance was not personal to that teacher and thus not fairly considered a matter of greater importance to the community. Turning to the issue of qualified immunity, I have not seen in Mr. Harlow's briefs or in his argument just now, where he thinks it is that this court or the Supreme Court has clearly established that a union official who files grievances on behalf of the union chapter at his school and represents other teachers is speaking as a private citizen and on a matter of public concern. And I know that Mr. Harlow relies on three district court decisions, but there's a big problem with that. The latest in time of those decisions is Payson, but it relies on Bennett and Bukowski, and both of those cases rely on Clu, the 1999 decision from this court, that has since been recognized as containing overbroad victim, that has since been walked back, and that cannot be reconciled with the subsequently decided case by the Supreme Court in Garcetti v. Ceballos. So I just don't think he can rely on those district court decisions, even assuming that they were competent to clearly establish the law. The second point I want to make as to qualified immunity is that if you look at the allegations in Mr. Augusto's complaint, he specifies certain things that Mr. Ureña was doing, letters to file and negative performance evaluations, from the end of the 2015 to 2016 school year to I believe the beginning of the 2017 to 2018 school year. That's it. There's no other allegations and certainly no allegation that Mr. Ureña caused a disciplinary proceeding to be initiated against Mr. Augusto, allegedly in retaliation for his union activity. So that is not fairly before the court, given that Mr. Augusto decided not to amend his complaint or seek leave to supplement his allegations in the court below. The final point I'd like to make is on the Monell issue. A school administrator who issues letters to file or negative performance evaluations is not making final policy on behalf of the New York City Department of Education. And here I think Judge Menasche's points were very sound. Even if, as Augusto claims in reply, the letters to file or negative performance evaluations were somehow final, at most that would show that Ureña was a final decision maker, not a final policymaker on behalf of the entirety of the New York City school system. And here I would also caution the court that I was listening to Mr. Harlow's argument and I just wasn't able to distinguish his argument from an argument for respondeat superior liability, which Monell specifically disallowed. So that is our argument on the First Amendment retaliation issues, and I'm happy to answer any questions that any member of the panel has on that or on the Title VII issues. Thank you. Judge Loyer. Thank you, Judge Cabanas. I have no questions. Judge Menasche. So on the Monell issue, there are some district court decisions in our circuit that say a principal is a policymaker for Monell purposes when he's harassing somebody. Do you think those decisions are wrong? Yes, I do, Your Honor. But I also think that the four district court decisions that I saw Augusto cite, Zambrano, and the three decisions that it rely on are just distinguishable. Only Zambrano involved an allegation of a principal doing anything to a teacher. But the allegation and the finding there was that the principal was a final policymaker with respect to denying the plaintiff the ability to go on a professional course at the end, right before she went on maternity leave, and then also denying her coming back to school at the end of that leave and ordering her off the school campus. Certainly, I have not seen any district court decision or any decision where a court has held that allegations that a principal is retaliating against a teacher is sufficient to render that principal a final policymaker for the entirety of the school district. Well, I mean, if the decision by a principal to deny somebody the ability to go on a professional course can be a policy of the New York City Department of Education, why can't the policy of using observation reports and letters to retaliate be a policy, even against Mr. Augusto specifically, be a policy of the New York City Department of Education? I guess I don't get the distinction. I think the answer to that question, Judge Manasseh, is one of discretion, because I disagree with Mr. Harlow to the extent that he says, to the extent that he describes the disciplinary policy at the New York City Department of Education. It's established by law much higher than the level of a principal at a high school, and it clearly outlines what needs to be substantiated before discipline can or can't be imposed. And in that respect, a principal at a high school doesn't have the kind of discretion over individual actions that he could take against the teacher, comparable to the fact of the Zambrano case. Right. But regardless, it sounds like your first position was you don't really think that that is a policy of the New York City Department of Education if it's done at an individual school. Yes, that's correct. I think that individuality and that discretion is a problematic aspect for Augusto's argument. So when Augusto was seeking these budgeted documents, why was that a personal grievance? That didn't have anything to do with him. That was about how the school was run and whether the school was wasting money, wasn't it? I think it could be framed in either of two ways, either as a matter of substance, because if you look at the grievance itself, as well as Augusto's deposition testimony, the reason he wanted the budget documents was because a previous assistant vice principal or assistant principal at the school was doing something with respect to per session payments, which is payments to teachers outside of their normal work or normal title. But even as a matter of process, I think your questioning of Mr. Harlow earlier, Judge Menasche, gets to the point, which is that the supposed popular interest in the way public institutions are run, and here we're talking about a single high school, just doesn't render something sufficiently a matter of public importance. So it can be not a matter of public importance without being a grievance that's personal to him. Yes, and you reminded me of a third point I wanted to make, Judge Menasche, so thank you for that. I think the issue here is that, to be sure, even assuming for the sake of argument that something isn't personal to him, and we can test that, if it's just shared among a group of teachers who are a member of this union at one high school, that's just not sufficiently of a matter of public concern. It goes back to the point about representing other teachers. Just because it's not personal to him doesn't mean it doesn't involve something that's just not a big enough picture issue to be fairly considered a matter of interest to the community at large. Okay, thank you very much. Okay. Very good. Mr. Harlow? Yes, thank you, Your Honor. I would just like to briefly make several points. First, regarding qualified immunity. My adversary keeps using this term throughout his argument and briefs that these grievances involve workplace issues internal to a single high school, but I cannot understand. This is just an inaccurate recitation of what these grievances were. Again, these grievances had to do with the fundamental aspects of unionization. They had implications far beyond the school, as indicated by this arbitration decision, which we included as part of the record. So, again, I just think this is incorrect characterization that these grievances had to do with personal issues or workplace issues internal to a single high school. And further, these cases, these district court cases, Pakowski, Bennett, and others, are good law, as well as Portela. Finally, just regarding Monell, just two quick points I would like to make. Mr. De Silva stated that the disciplinary policy or the policies for these letters to file and individual observation reports are made at a much higher level, but that's incorrect. There is no chances regulation that describes the manner in which a principal should engage in these individual observation reports. They can engage when they want, how often they want, and the criteria themselves are inherently discretionary. So, I just don't think it's accurate that there's a higher policy that governs this, which is why that this policy, as Judge Monash probably pointed out, that, like in Zambrano, these principals can make policy in the schools. And my final point, I would just like to make one reference in reference to Judge Monash's question to me earlier regarding these budget requests. I neglected to mention the Supreme Court case, City of San Diego v. Roe, in which the court held that the allocation of a school's budget, which is based on public funds, plainly is of – I'm sorry, this is in regards to the qualified immunity argument. Excuse me. Nevertheless. You have a minute left. So, City of San Diego v. Roe held that the allocation of a school's budget, which is based on public funds, plainly is of value and concern to the public. So, just in regard to Mr. Argos' request for a budget request, I think it's very clear that this act constituted a matter of public concern. Thank you, Your Honors. If there's any further questions, I would be happy to answer them. Judge Laurier? No, I have no questions. Thank you. Judge Cabanes? Judge Monash? That's fine. Thank you.  Well, thank you. Thank you, Your Honors. The court thanks both Mr. Harlow and Mr. Silvio for their fine arguments. We reserve the decision.